**People of the State of Illinois, Plaintiff-Appellee, v. Loree Parker, Defendant-Appellant.**

**Gen. No. 53,781.**

First District, Third Division.

January 29, 1970.

Gerald W. Getty, Public Defender of Cook County, of Chicago (Saul H. Brauner, Norman W. Fishman, and James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

Edward V. Hanrahan, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Patrick T. Driscoll, Jr., Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE SCHWARTZ delivered the opinion of the court.

Defendant was indicted for the murder of one Arthur Brown. The indictment consisted of two counts, the first of which charged that she intentionally and knowingly stabbed Brown and the second, that she stabbed him knowing there was a strong probability of death or great bodily harm. Defendant waived jury trial, was tried by the court and found guilty of manslaughter as a lesser included offense and was sentenced to serve a term of not less than two nor more than three years in the Illinois State Reformatory for Women. The defendant ap-

peals, contending she was acting in self-defense and that the evidence is sufficient to raise a reasonable doubt of her guilt. The facts follow.

Paul Hutson, a security officer for the Illinois Bell Telephone Company, testified that on March 9, 1968 at 10:35 p. m. he was on duty at his employer's facility at 3456 West Adams Street, Chicago. It was his duty to escort employees to their cars in the parking lot or to the bus stop. As he was escorting an employee through the parking lot on the east side of the building he observed two people standing in a driveway connecting the lot with Adams Street. They were not tussling but were speaking loudly. The lighting conditions were good and he passed within 25 feet of them. Defendant was identified as one of the pair and the deceased was named as the other. The deceased had his hands on the uppermost part of defendant's arms near her shoulders, while defendant's hands were on his chest. A moment later the deceased stepped backward a few paces, leaned against a cab which had pulled into the driveway and slipped to the pavement. He had nothing in his hands while he was holding the defendant's arms nor when he staggered back. Immediately following this the defendant began to walk east on Adams Street while Hutson went to the aid of the deceased. Seeing that Brown was bleeding, Hutson called out to the defendant and asked her to return. She answered that Brown was only scratched and was asleep. She returned to where he was lying, picked up a knife that was nearby, closed it and put it in Brown's front pocket. Hutson did not notice any cuts or bruises on the defendant at that time.

Daniel McGrory, a Chicago police officer, testified that on March 9, 1968, at approximately 10:35 p. m. he was in the vicinity of the telephone company's facility at 3456 West Adams Street. He saw a security guard (Hutson) motioning to him. He stopped his car, walked over to the

guard and saw the deceased lying in the driveway and a woman, whom he identified as the defendant, standing next to the deceased. He removed a knife from the victim's pocket.

Willie Brown, a cousin of the deceased, testified for the defense that at 4:00 p. m. on March 9, 1968, the deceased telephoned him from the apartment of Emma Wash and asked whether he would join them there. Brown went to the apartment, arriving at about 5:00 p. m. Shortly before 10:00 p. m. defendant and the deceased engaged in an argument during which the deceased brandished a knife and threatened to kill defendant if she picked up some money he had put on a table. Defendant got her coat and left without taking the money. The deceased followed some ten or fifteen minutes later. The witness further testified that he and the deceased shared a pint of whiskey in the apartment and he also testified that he had been present on an occasion prior to the night in question when the deceased cut defendant with a can opener.

On direct examination defendant testified that she was the "common-law wife" of the deceased and had been living with him for fourteen years. In the early evening of March 4, 1968, she and the deceased went to Emma Wash's apartment. Later that evening the deceased started an argument with her during which he displayed an open pocketknife and said he was going to "cut her." They had both been drinking. The defendant was afraid he would kill her but did not call the police because she did not want him arrested. She further testified that she left the apartment some five or ten minutes after the deceased had threatened her and that he followed her about five minutes later. There was another confrontation on the street in front of the building they had just left. The deceased attempted to slash defendant with his knife and threatened to kill her when they "got to the

74

house." She threw two pop bottles at him, but did not hit him.

Defendant further testified that she continued walking toward her apartment until she reached a telephone booth on the premises of the telephone company at 3456 West Adams Street. The deceased who had been following her asked her to dial a number for him and she did so. While he was talking on the telephone he told her he was going to kill her. By the time he finished his call they had both drawn their knives. The deceased cut her on the top of her head, but she was able to grab his right arm and temporarily thwart his attack. While he was trying to free the knife from his right hand she stabbed him because, as she stated, she was afraid of him.

During an extensive cross-examination defendant testified that she "once cut Mr. Brown," (the deceased) during a knife fight in 1961 or 1962 and that on the night of the occurrence here she stabbed him with her knife. She testified that he did not stab himself with his own knife. She then admitted that on the night she was arrested she had told the police the deceased was stabbed by his own knife. When questioned as to how the stabbing occurred, she testified that while the deceased was talking on the telephone, she pushed open the door to the booth. She changed her mind and tried to close the door, but a struggle ensued when the deceased tried to hold it open. She later testified that he opened the door himself while she was standing in front of it with her back to him. They tussled toward the driveway, but at no time while in the driveway did the deceased lunge at her with his knife nor did he "make any motions as if to cut her." She further testified that after they struggled a few minutes the deceased staggered backward, bumped into a cab which had just pulled into the driveway and dropped his knife as he slipped to the ground. She then put her knife in her brassiere but not until after Hutson

had come to the deceased's aid and had called her back to the driveway. She was able to keep the knife concealed under her brassiere when she was searched by the matron at police headquarters.

In rebuttal the State called detective Walter Siemieniak who had interviewed defendant at the local police station a short time after her arrest. He informed her of her constitutional rights and interrogated her about the events surrounding the homicide. She told him a different story. She said the deceased threatened her with a knife he held in his left hand and that she swung her arms to knock it out of his grip but instead it was thrust into his chest. Detective Siemieniak also testified that he visually examined defendant's head at the time he interviewed her and did not find any blood nor did she complain of any injury.

Defendant's sole contention is that under sections 7–14 and 3–2 of the Criminal Code (Ill Rev Stats, c 38 (1967)) the evidence was insufficient to establish guilt beyond a reasonable doubt since the State failed to prove the killing was not in self-defense. Section 7–14 of the Criminal Code provides that self-defense is an affirmative defense and section 3–2 provides:

> "(a) 'Affirmative defense' means that unless the State's evidence raises the issue involving the alleged defense, the defendant, to raise the issue, must present some evidence thereon.

> "(b) If the issue involved in an affirmative defense is raised then the State must sustain the burden of proving the defendant guilty beyond a reasonable doubt as to that issue together with all the other elements of the offense."

That is to say, once an affirmative defense is interposed by the introduction of "some evidence" by either the State or the defense, the burden devolves upon the State

76

to prove guilt beyond a reasonable doubt as to that issue as well as to all other elements of the offense.

Defendant argues that her testimony that she was acting in self-defense was not contradicted in any material respect by Hutson, the only eyewitness other than herself. An examination of Hutson's testimony as hereinbefore noted, reveals however that it supports the State's case and contradicts important aspects of defendant's version of the occurrence. Moreover, her testimony was not only self-impeaching but was inconsistent with her prior statements and with other evidence. She testified that the deceased cut her on the top of her head when they were standing next to a telephone booth at 3456 West Adams Street. Later she testified that the cut was "only a scratch" and she "wasn't hurt." Both Hutson and officer Siemieniak testified they saw no blood on defendant's head. Defendant testified at one point that she stabbed the deceased as he stepped out of the telephone booth because she was "afraid of him," and at another point that she did not know whether she stabbed him at that time. She also testified that after she stabbed him, she put the knife she had used under her brassiere and that this was done in Hutson's presence after he came to the aid of the deceased. The knife was still under her brassiere according to her testimony when she was subjected to a thorough search at police headquarters but the matron was unable to find it. Hutson testified, however, that he was watching the defendant at the time she asserts she concealed the knife and that he did not see her do so. And again defendant testified that the deceased dropped his knife as he slipped to the ground after bumping into a cab in the driveway. Hutson testified that he was watching the deceased at that time but saw nothing in his hands. Defendant admitted that she told officer Siemieniak on the night of her arrest that only the deceased had a knife and that he was stabbed

with his own knife, although she testified that they both had knives and that she stabbed him with her knife. She also admitted telling officer Siemieniak that they were fighting because the deceased was interested in another woman. Her testimony was that the fight grew out of an argument over money.

 A reviewing court will not disturb a verdict of guilt unless the evidence is so palpably contrary to the verdict or so unsatisfactory as to justify entertaining a reasonable doubt of the defendant's guilt. People v. Mc-Clain, 410 Ill 280, 102 NE2d 134; People v. Jordan, 18 Ill2d 489, 165 NE2d 296; People v. Owens, 73 Ill App2d 108, 219 NE2d 733. Whether a homicide was justified under the law of self-defense is a question of fact. People v. Johnson, 108 Ill App2d 150, 247 NE2d 10; People v. Watt, 101 Ill App2d 36, 241 NE2d 463. When, as here, the evidence is conflicting, it is the function of the trier of fact to resolve the conflict and determine the credibility of the witnesses. People v. Bolger, 359 Ill 58, 194 NE 225; People v. Brumbeloe, 97 Ill App2d 370, 240 NE2d 150. Defendant's testimony when viewed in the light of the whole record is not sufficient to raise a reasonable doubt of her guilt and accordingly the judgment is affirmed.

Judgment affirmed.

DEMPSEY, P. J. and McNAMARA, J., concur.